SECOND DIVISION
FILED: February 13, 2007

No. 1-06-1533

| | |
|---|---|
| FULLER FAMILY HOLDINGS, LLC, | ) APPEAL FROM THE CIRCUIT |
| | ) COURT OF COOK COUNTY |
| Plaintiff-Appellant, | ) |
| | ) No. 04 L 014582 |
| v. | ) |
| | ) HONORABLE |
| THE NORTHERN TRUST COMPANY, | ) MARTIN S. AGRAN, |
| | ) RANDYE A. KOGAN, |
| Defendant-Appellee. | ) JUDGES PRESIDING. |

JUSTICE HOFFMAN delivered the opinion of the court:

The plaintiff, Fuller Family Holdings, LLC, (Fuller Holdings), as successor in interest to the William A. Fuller Indenture of Trust (Fuller Trust or the trust), appeals the dismissal of its action against the defendant, The Northern Trust Company (Northern), asserting claims for (1) breach of fiduciary duty, and (2) spoliation of evidence. For the reasons that follow, we reverse and remand for further proceedings.

The allegations in the corrected complaint, the affidavit in support of the motion to dismiss, and their attached exhibits reveal the following relevant facts, which we must accept as true in reviewing the circuit court's dismissal pursuant to section 2-619 of the Code of Civil Procedure (the Code) (735 ILCS 5/2-619 (West 2004)).

On February 28, 1918, William A. Fuller created the Fuller Trust and named Northern as trustee. Northern acted as trustee of the Fuller Trust from 1918 until 2002. The primary asset of the trust was a parcel of real property located at 30 North LaSalle Street in Chicago, Illinois, known as the Fuller Parcel.

No. 1-06-1533

In 1968, a plan was proposed to redevelop the land at 30 North LaSalle Street and to construct a high-rise building on the Fuller Parcel and adjacent properties, including a parcel of land owned by a LaSalle National Bank land trust (LaSalle Trust), known as the Civic Center Parcel. With approval from the Fuller Trust beneficiaries and the circuit court, Northern cancelled the existing ground lease on the Fuller Parcel and entered into a new lease with the LaSalle Trust, referred to as the Fuller Lease. The Fuller Lease contained several provisions concerning the construction of a new high-rise building and provided for the payment of three types of rent to the Fuller Trust: minimum ground rent, additional ground rent, and percentage rent. Additional ground rent would be due if the value of the land exceeded a certain amount after periodic reappraisals. Percentage rent would be due if the tenant's yearly income from the property exceeded the minimum ground rent and additional ground rent by a specified amount.

Northern also entered into a supplemental agreement with the LaSalle Trust and the owner of a third adjacent parcel to jointly construct a new building on all of their properties. Pursuant to this agreement, a new high-rise office building, known as the 30 North LaSalle building, was constructed on the Fuller Parcel, the Civic Center Parcel, and the adjacent parcel.

In or prior to 1972, the beneficial interest in the LaSalle Trust was assigned to the 30 North LaSalle Street Corporation. In addition, the LaSalle Trust's leasehold interest in the Fuller Lease was assigned to the American National Bank & Trust Company, as trustee under Trust No. 28985, (American National Trust), which became the new tenant/developer of the property. The American National Trust experienced difficulty securing mortgage financing for the new building and requested that Northern amend the Fuller Lease to facilitate such financing. After obtaining approval from the

2

circuit court, Northern amended the Fuller Lease in August 1972 to accommodate the American National Trust in securing financing from its lender, Prudential Insurance Company (Prudential).

Pursuant to the Fuller Lease amendments, the American National Trust was named the lessee, the amount of minimum ground rent was increased, and the amounts of additional ground rent and percentage rent were modified. Also, Northern agreed to subordinate the trust's right to collect the additional ground and percentage rents to the payments due from the American National Trust to Prudential on the leasehold mortgages. In particular, paragraph 13 of the August 23, 1972 lease amendment added a new section 3.4 to the lease, which provided as follows:

"SUBORDINATION OF PERCENTAGE RENT AND ADDITIONAL GROUND RENT. The right of [the Fuller Trust] to collect or receive Percentage Rent shall always be subject and subordinate to the right of the owners and holders of the Original Leasehold Mortgages to collect and receive the indebtedness secured by said Original Leasehold Mortgages; and the right of [the Fuller Trust] to collect or receive Additional Ground Rent based upon appraisals made prior to January 1, 2000, shall also be subject and subordinate to the right of the owners and holders of the Original Leasehold Mortgages to collect and receive the indebtedness secured by said Original Leasehold Mortgages.

If the holders of *** the Original Leasehold Mortgages *** shall foreclose said mortgage or shall accept a conveyance or assignment of the leasehold estate *** in lieu of foreclosure, *** then and in any such event, *** no Additional Ground Rent whatsoever shall be due or payable then or thereafter under this lease *** by the

3

holders of either of the Original Leasehold Mortgages *** save and except Additional Ground Rent, if any, based upon appraisals made on and after January 1, 2000. Additional Ground Rent due on account of any reappraisals made as of January 1, 2000 and thereafter shall not be subordinated to the lien of any mortgage."

In addition, paragraph 14 of the August 23, 1972 lease amendment added a new section 3.5 to the lease, which provided as follows:

"TERMINATION OF PERCENTAGE RENT. If the holders of either of the Original Leasehold Mortgages *** shall foreclose said mortgage or shall accept a conveyance or assignment of the leasehold estate *** in lieu of foreclosure, *** then and in any such event, *** no Percentage Rent whatsoever shall be due or payable then or at any time thereafter during the term of this lease *** by the holders of either of the Original Leasehold Mortgages *** and the provisions of [section 2.1©)] shall terminate as of the date upon which foreclosure *** is complete, the date upon which the holder of either of the Original Leasehold Mortgages *** accepts a conveyance or assignment of the leasehold interest *** or the date the holder of either of the Original Leasehold Mortgages *** becomes the Tenant under this lease *** whichever of said dates shall first occur."

In consideration for these amendments to the Fuller Lease, the American National Trust and the 30 North LaSalle Street Corporation executed a guarantee in favor of the Fuller Trust (guarantee). Although the guarantee, dated September 14, 1972, is not included in the record on appeal, a draft guarantee, dated September 12, 1972, was attached as an exhibit to both the corrected

complaint and the motion to dismiss. The parties agree that the executed guarantee has been lost and that its terms are identical to or are substantially identical to those contained in the draft guarantee. For purposes of reviewing the dismissal of the corrected complaint under section 2-619, we accept as true the allegation that the substantive terms of the guarantee are identical to the substantive terms of the draft guarantee. We note, however, that the draft guarantee listed American National Bank and Trust Company as the sole guarantor.

The draft guarantee promised payment of the additional ground and percentage rents "during any period when the same may not be payable by the tenant under the Fuller Lease because of the subordination thereof to the Original Leasehold Mortgages". The draft guarantee provided that it would continue during the entire term of the Fuller Lease as to percentage rent and until January 1, 2000, as to additional ground rent. The draft guarantee also provided that it would survive the assignment, sale or conveyance of the interest of the guarantor in the Fuller Lease and would not be released, diminished or affected by any such assignment, sale or conveyance. In addition, the draft guarantee stated that the obligations of the guarantor were independent of its obligations as tenant under the Fuller Lease.

As further consideration for the 1972 amendments to the Fuller Lease, the LaSalle Trust executed an assignment of rents, assigning to the Fuller Trust its right to receive minimum ground rent due from the American National Trust under its lease of the Civic Center Parcel. The LaSalle Trust also executed a mortgage on the Civic Center Parcel in favor of the Fuller Trust, which secured performance under (1) the guarantee of the payment of additional ground and percentage rents under the Fuller Lease and the 1972 amendments, (2) the assignment of rents under the Civic Center Lease,

5

and (3) the obligation of the American National Trust to pay minimum ground rent under the Fuller Lease. Prudential ultimately provided financing for the project and became the leasehold mortgagee.

The American National Trust subsequently defaulted on its leasehold mortgage payments to Prudential, and in 1978, Prudential accepted an assignment of the Fuller Lease in lieu of foreclosure of the leasehold mortgages and became the tenant of the 30 North LaSalle building. Pursuant to the terms of the Fuller Lease amendments, after Prudential accepted the assignment in lieu of foreclosure, Prudential's obligation to pay additional ground rent was abated until January 1, 2000, and the obligation to pay percentage rent was terminated.

In 1992 and 1993, in response to inquiries by certain Fuller Trust beneficiaries about the payment of the additional ground and percentage rents on the 30 North LaSalle building, Northern sent three letters referring to and explaining the Fuller Lease amendments relating to these rental payments. Included as attachments to those letters were copies of the original Fuller Lease, the 1972 lease amendments, the assignment of rents due under the Civic Center Lease, and the mortgage on the Civic Center Parcel in favor of the Fuller Trust. In its third letter, dated June 15, 1993, Northern stated that "the amended lease provided that if the [m]ortgage on the building was foreclosed, the percentage of revenue would no longer be paid and the reappraisal process would not commence until January 1, 2000."

The 30 North LaSalle building was sold in 1997, and in connection with that sale, Northern executed a Landlord's Estoppel Certificate, indicating that no additional ground rent was due and payable under the Fuller Lease until January 1, 2000, and that there was no obligation to pay

6

percentage rent because that obligation had been permanently terminated in accordance with the terms of the amended lease.

On December 20, 2000, Northern filed an action in the circuit court seeking guidance concerning certain terms of the Fuller Trust. In particular, Northern's complaint for instructions requested that the court determine the termination date of the trust, the proper disposition of the trust assets upon termination, and whether Northern had the power to sell the trust's real estate prior to termination. All current and contingent beneficiaries of the Fuller Trust were named as defendants, and they retained counsel to represent their various interests in the action brought by Northern.

While Northern's action for instructions was pending, the trust beneficiaries and their counsel inquired as to whether the Fuller Trust held title to the Civic Center Parcel. In response, Northern advised that there was no evidence the trust owned the Civic Center Parcel, but the Fuller Trust held a mortgage and assignment of rents on the parcel. Also during the pendency of this litigation, the Fuller Trust beneficiaries made several requests asking that Northern locate a copy of the guarantee, dated September 14, 1972, guaranteeing the payment of additional ground rent and percentage rent payable under the Fuller Lease. In letters dated April 25, 2001, and May 10, 2001, W.T. Fuller, one of the trust beneficiaries, requested a copy of the guarantee, and he asked Northern to "take all steps" necessary to locate the document. Although it searched its own records and served subpoenas for records on other entities in an effort to locate the guarantee, Northern did not locate either the original or a copy of the guarantee.

On June 26, 2002, Northern and Fuller Holdings, the holding company established by the beneficiaries of the Fuller Trust, entered into a settlement agreement resolving the litigation initiated

7

by Northern's complaint for instructions. Pursuant to the terms of the settlement agreement, the Fuller Trust was terminated, and the trust conveyed to Fuller Holdings its interests in cash, certain marketable securities, and two interests in real property. These two real property interests were referred to as the "Property" in the settlement agreement and were particularly defined as (1) an interest in the Fuller Parcel, subject to the Fuller Lease and the 1972 lease amendments, and (2) an interest in the Civic Center Parcel granted under a mortgage, which recites that it is "security for performance in accordance with the terms of [the] guarantee dated September 14, 1972 guaranteeing the payment of certain Additional Ground Rent and Percentage Rent payable under the [Fuller Lease] as amended by agreements dated August 15, 1972 and August 23, 1972".

Paragraph 11 of the settlement agreement provided:

"Release of Claims against The Northern. For and in consideration of the distributions described in this Settlement Agreement, the beneficiaries and each of them, hereby fully, forever, irrevocably and unconditionally release and discharge The Northern, as trustee and in its corporate capacity and its employees, officers, directors, stockholders, affiliates, attorneys, agents, successors and assigns from any and all claims, charges, complaints, demands, actions, suits, obligations, liabilities and expenses arising out of determination of the Trust's termination date and the termination of the Trust, in accordance with the terms of the Settlement Agreement, including, but not limited to, The Northern's transfer of the Property upon termination to the Fuller Family Holdings LLC, on behalf of the current income beneficiaries of the Trust as Members of the Fuller Family Holdings LLC and The Northern's transfer

8

of the cash and marketable securities to the current income beneficiaries of the Trust,

in each case, pursuant to the terms of this Settlement Agreement; provided, however,

that this release shall not apply to any claims arising from a breach of the provisions

of this Settlement Agreement."

Paragraph 21 of the agreement also provided that the parties agreed to assume the risk of the possible discovery of additional or different facts and that the settlement would remain in effect regardless of the discovery of any additional or different facts.

On June 28, 2002, the circuit court approved the settlement agreement and dismissed the action brought by Northern. Approximately 10 months later, counsel for the trust beneficiaries contacted Northern and requested permission to review its files in an effort to locate the guarantee. Northern denied this request but continued to search for the document. In January 2004, Northern located a draft guarantee in its archives and, on February 19, 2004, forwarded a copy of the document with a letter to W.T. Fuller, one of the trust beneficiaries.

In its letter, Northern advised Fuller that it did not believe the guarantee represented a continuing guarantee of the payment of the additional ground and percentage rents after Prudential accepted the assignment of the leasehold interest of the American National Trust in lieu of foreclosure. Northern explained its position that the guarantee was effective only while the additional ground and percentage rents were subordinated to the leasehold mortgages held by Prudential and that the guarantee had no effect in the event of a foreclosure or the acceptance of an assignment of the leasehold interest in lieu of foreclosure by Prudential. In addition, Northern stated that the terms of the guarantee had not been triggered since there had been no default in the payment of additional

9

ground rent or percentage rent because the 1972 lease amendments provided that, after Prudential accepted the assignment of the leasehold interest in lieu of foreclosure, the percentage rent was terminated and the additional ground rent was abated until January 1, 2000.

In December 2004, Fuller Holdings initiated this action against Northern. Count I of the complaint alleged a breach of fiduciary duty based on Northern's failure to enforce the terms of the guarantee and exercise the right to foreclose on the mortgage on the Civic Center Parcel and on Northern's failure to advise the trust beneficiaries of these rights. Count II asserted an alternative claim for spoliation of evidence based on the loss of the written guarantee.

Northern moved to dismiss the action pursuant to section 2-619 of the Code of Civil Procedure (the Code) (735 ILCS 5/2-619 (West 2004)), asserting that Fuller Holdings' claims were barred on four grounds: (1) expiration of the statute of limitations; (2) res judicata; (3) a prior release of the claims; and (4) the lack of an existing duty by the trustee. The circuit court dismissed the breach of fiduciary duty claim, finding that this claim was released by the trust beneficiaries in the June 2002 settlement agreement. The court also dismissed as moot the spoliation of evidence claim based on the fact that the breach of fiduciary duty claim had been dismissed pursuant to a prior release and, consequently, the inability to locate the guarantee could not have resulted in injury to the trust beneficiaries. Fuller Holdings has appealed.

An action will be dismissed under section 2-619 of the Code if, after construing the pleadings and supporting documents in the light most favorable to the nonmoving party, the trial court finds that no set of facts can be proved upon which relief could be granted. Webb v. Damisch, 362 Ill. App. 3d 1032, 1037, 842 N.E.2d 140 (2005). A section 2-619 motion to dismiss admits the legal

sufficiency of the complaint and raises defects, defenses, or other affirmative matters that defeat the claim. Cohen v. McDonald's Corp., 347 Ill. App. 3d 627, 632, 808 N.E.2d 1 (2004). In reviewing the grant of a motion to dismiss under section 2-619, this court accepts as true the well-pled allegations of the plaintiff's complaint and the evidentiary facts in a defendant's supporting affidavit which have not been refuted in a counteraffidavit of the plaintiff. Board of Managers of the Village Centre Condominium Association v. Wilmette Partners, 198 Ill. 2d 132, 134, 760 N.E.2d 976 (2001); Kawaguchi v. Gainer, 361 Ill. App. 3d 229, 236, 835 N.E.2d 435 (2005). The relevant question is whether there exists a genuine issue of material fact precluding dismissal, or absent an issue of material fact, whether dismissal is proper as a matter of law. Lykowski v. Bergman, 299 Ill. App. 3d 157, 164, 700 N.E.2d 1064 (1998). Review of such a dismissal is de novo. Martin v. Illinois Farmers Insurance, 318 Ill. App. 3d 751, 757, 742 N.E.2d 848 (2000).

On appeal, Fuller Holdings challenges the dismissal of its breach of fiduciary duty claim against Northern, arguing that the circuit court erred in holding that this claim was released in the June 2002 settlement agreement between the parties. We agree.

A release is a contract whereby a party abandons a claim to the person against whom the claim exists. Thornwood, Inc. v. Jenner & Block, 344 Ill. App. 3d 15, 21, 799 N.E.2d 756 (2003). Accordingly, the interpretation of a release is governed by contract law. Farm Credit Bank v. Whitlock, 144 Ill. 2d 440, 447, 581 N.E.2d 664 (1991). Where the terms of the release are clear and explicit, the court must enforce them as written, and construction of the instrument is a question of law. Rakowski v. Lucente, 104 Ill. 2d 317, 323, 472 N.E.2d 791 (1984); Thornwood, Inc., 344 Ill.

No. 1-06-1533

App. 3d at 21; Hurd v. Wildman, Harrold, Allen and Dixon, 303 Ill. App. 3d 84, 89, 707 N.E.2d 609 (1999).

General words of release are restrained in effect by the specific recitals contained in the document. Carona v. Illinois Central Gulf R.R. Co., 203 Ill. App. 3d 947, 951, 561 N.E.2d 239 (1990). Releases are strictly construed against the benefitting party and must spell out the intention of the parties with great particularity. Scott & Fetzer Co. v. Montgomery Ward & Co., 112 Ill. 2d 378, 395, 493 N.E.2d 1022 (1986); Stratman v. Brent, 291 Ill. App.3d 123, 137, 683 N.E.2d 951 (1997). The intention of the parties controls the scope and effect of the release, and this intent is discerned from the release's express language as well as the circumstances surrounding the agreement. Adams v. American International Group, Inc., 339 Ill. App. 3d 669, 676, 791 N.E.2d 26 (2003); Doctor's Assoc., Inc., v. Duree, 319 Ill. App. 3d 1032, 1045, 745 N.E.2d 1270 (2001). Where a releasing party was unaware of other claims, Illinois law restricts the release to the particular claims that are explicitly covered by the agreement. Farm Credit Bank, 144 Ill. 2d at 447. Therefore, a release will not be construed to defeat a valid claim that was not within the contemplation of the parties at the time the agreement was executed, and general words of release are inapplicable to unknown claims. Farm Credit Bank, 144 Ill. 2d at 447-48; Thornwood, Inc., 344 Ill. App. 3d at 21.

In this case, the settlement agreement provided that the trust beneficiaries released "any and all claims *** arising out of the determination of the Trust's termination date, and the termination of the Trust *** including, but not limited to, The Northern's transfer of the Property upon termination to the Fuller Family Holdings LLC, *** and The Northern's transfer of the cash and marketable securities *** provided, however, that this release shall not apply to any claims arising from a breach

12

of the provisions of this Settlement Agreement." These clear and explicit terms, which must be enforced as written, expressly limited the release to claims arising out of the determination of the trust's termination date and the proper disposition of the trust assets, which were the only issues raised in Northern's complaint for instructions.

As noted above, the trust's assets included interests in cash and certain marketable securities, as well as the two interests in real property. These two real property interests, consisting of the ownership interest in the Fuller Parcel and the mortgage interest in the Civic Center Parcel, were referred to in the settlement agreement as the "Property". The breach of fiduciary duty claim did not fall into any of these categories; it was not cash, a marketable security, or a real property interest in either the Fuller Parcel or the Civic Center Parcel. Thus, the settlement agreement did not include the breach of fiduciary duty claim in the trust assets and "Property" conveyed to Fuller Holdings, nor did the agreement indicate the parties' intent to release this claim pursuant to the settlement of the action for instructions. Because the express language of the settlement agreement, which controls the scope and effect of the release, reflects that the Fuller Trust beneficiaries intended to release only those claims stemming from the determination of the trust's termination date and the distribution of the trust's assets, the circuit court erred in finding that the settlement agreement released the breach of fiduciary duty claim. See Farm Credit Bank, 144 Ill. 2d at 447; Doctor's Assoc., Inc., 319 Ill. App. 3d at 1045.

Our conclusion in this regard is further supported by the fact that the breach of fiduciary duty claim did not belong to the trust. A trustee owes a fiduciary duty to a trust's beneficiaries and is obligated to carry out the trust according to its terms and to act with the highest degrees of fidelity

and utmost good faith. In re Estate of Muppavarapu, 359 Ill. App. 3d 925, 929, 836 N.E.2d 74 (2005); Paul H. Schwendener, Inc. v. Jupiter Elec. Co., Inc., 358 Ill. App.3d 65, 74, 829 N.E.2d 818 (2005); Giagnorio v. Emmett C. Torkelson Trust, 292 Ill. App. 3d 318, 325, 686 N.E.2d 42 (1997); see also Restatement (Second) of Trusts § 2, Comment b (1959); Restatement (Second) of Trusts § 170 (1959). The fiduciary obligation of loyalty flows not from the trust instrument but from the relationship of trustee and beneficiary, and the essence of this relationship is that the trustee is charged with equitable duties toward the beneficiary. Home Federal Savings and Loan Ass'n of Chicago v. Zarkin, 89 Ill. 2d 232, 239, 432 N.E.2d 841 (1982); Restatement (Second) of Trusts § 164, comment h (1959). By virtue of the fiduciary relationship of the trustee and beneficiary, it is the trust beneficiary who has the right to bring an action for damages based on a breach of fiduciary duty by the trustee. Parish v. Parish, 29 Ill. 2d 141, 149, 193 N.E.2d 761 (1963); Burrows v. Palmer, 5 Ill. 2d 434, 439-40, 125 N.E.2d 484 (1955); Restatement (Second) of Trusts § 199 (1959).

Here, the breach of fiduciary duty claim constituted a cause of action belonging to the Fuller Trust beneficiaries and was not a property right or an asset of the Fuller Trust. Consequently, the right to assert this claim was not transferred to Fuller Holdings pursuant to the settlement agreement, nor was it included among the claims released pursuant thereto.

In seeking affirmance of the circuit court's decision, Northern argues that, even though the settlement agreement did not expressly release the breach of fiduciary duty claim, the agreement should be construed to encompass this claim because the trust beneficiaries knew or should have known of the existence of the claim prior to execution of the settlement agreement. We decline to address this argument because we find that the provisions of the settlement agreement are clear and

unambiguous, and extrinsic evidence regarding what information the trust beneficiaries knew or should have known prior to the settlement may not be considered. Suburban Ins. Services, Inc. v. Virginia Surety Co., Inc., 322 Ill. App. 3d 688, 691, 752 N.E.2d 15 (2001) (holding that if a contract is clear and unambiguous, the intent of the parties must be determined solely from the contract's plain language, and extrinsic evidence outside the "four corners" of the document may not be considered).

Though we have concluded the circuit court erred in finding that the settlement agreement released the plaintiff's breach of fiduciary duty claim, we recognize that, as an appellee, Northern may argue that the decision of the circuit court should be affirmed on other grounds. Estate of Johnson v. Condell Memorial Hospital, 119 Ill.2d 496, 502, 520 N.E.2d 37 (1988); Wade v. City of Chicago, 364 Ill. App. 3d 773, 780, 847 N.E.2d 631 (2006). On appeal, Northern argues three additional grounds as alternative bases for affirming the circuit court's decision: (1) res judicata; (2) expiration of the statute of limitations; and (3) the terms of the guarantee precluded Northern from foreclosing on the Civic Center mortgage. We address each alternative ground in turn.

Initially, Northern asserts that the breach of fiduciary duty claim was barred by the doctrine of res judicata because the trust beneficiaries could have, but failed to, raise this claim in the prior litigation on Northern's complaint for instructions. We disagree.

The doctrine of res judicata provides that a final judgment on the merits rendered by a court of competent jurisdiction is conclusive as to the rights of the parties and their privies, and constitutes an absolute bar to a subsequent action involving the same claim, demand, or cause of action. Nowak v. St. Rita High School, 197 Ill. 2d 381, 389, 757 N.E.2d 471 (2001); Stillo v. State Retirement Systems, 366 Ill. App. 3d 660, 663, 852 N.E.2d 516 (2006). Res judicata serves as a bar to litigation

of all issues that were actually decided and of all issues that could have been raised and determined in the earlier action. Arvia v. Madigan, 209 Ill. 2d 520, 533, 809 N.E.2d 88 (2004); Stillo, 366 Ill. App. 3d at 663.

In Illinois, counterclaims are generally permissive rather than mandatory. See 735 ILCS 5/2-608(a) (West 2004); Corcoran-Hakala v. Dowd, 362 Ill. App. 3d 523, 530, 840 N.E.2d 286 (2005). Therefore, a defendant generally may raise his or her claim against the plaintiff by way of a counterclaim or by way of a separate action. Corcoran-Hakala, 362 Ill. App. 3d at 530-31. Yet, res judicata bars the separate action if successful prosecution of that action would in effect nullify the judgment entered in the prior litigation. Corcoran-Hakala, 362 Ill. App. 3d at 531. More particularly, if the defendant's claim involves the same operative facts as the plaintiff's claim, res judicata may bar the defendant from raising his or her claim in a subsequent action. Corcoran-Hakala, 362 Ill. App. 3d at 531.

Illinois courts apply the "transactional test" in determining whether the subsequent action arises from the same set of operative facts as the original action. River Park Inc. v. City of Highland Park, 184 Ill. 2d 290, 309, 703 N.E.2d 883 (1998). Thus, in deciding whether two suits involve the same cause of action for purposes of res judicata, the court considers the facts that give rise to the claim for relief. River Park, 184 Ill. 2d at 309-10. A subsequent claim predicated on a different theory of relief constitutes a single cause of action if a single group of operative facts gave rise to the assertion of relief in both actions. River Park, 184 Ill. 2d at 307.

Here, the issues resolved in the previous litigation initiated by Northern's December 2000 complaint for instructions consisted only of the termination date of the trust and of the proper

16

disposition of the trust assets upon termination. The operative facts underlying that earlier litigation involved the birth dates of two of the trust settlor's lineal descendants and the agreement that the trust assets could properly be disposed of by transferring them to a holding company established by the beneficiaries. These facts were entirely unrelated to the facts underlying the breach of fiduciary duty claim asserted in this case, which was premised on the terms of the guarantee and on the contention that Northern could and should have taken action to enforce the guarantee and to foreclose on the Civic Center mortgage. Because this action and the prior litigation were not predicated on a single group of operative facts, the doctrine of res judicata does not bar the breach of fiduciary duty claim, and the circuit court correctly refused to dismiss the claim on that basis.

Next Northern contends that the breach of fiduciary duty claim was subject to dismissal because it was untimely. In particular, Northern claims that because the trust beneficiaries knew or should have known of the breach of fiduciary duty claim as early as 1993, the five-year limitations period would have expired in 1998, and the plaintiff's complaint filed in December 2004 was not timely. We disagree.

Pursuant to section 13-205 of the Code, a breach of fiduciary duty claim must be brought within five years after the cause of action accrued. 735 ILCS 5/13-205 (West 2004); Armstong v. Guigler, 174 Ill. 2d 281, 296-97, 673 N.E.2d 290 (1996); Luminall Paints, Inc. v. La Salle National Bank, 220 Ill. App. 3d 796, 803, 581 N.E.2d 191 (1991). However, under the discovery rule, which is applicable to breach of fiduciary duty claims, the cause of action accrues and the limitations period commences when the plaintiff knew or reasonably should have known of the injury and that it was wrongfully caused. Armstong, 174 Ill. 2d at 296-97; Knox College v. Celotex Corp., 88 Ill. 2d 407,

No. 1-06-1533

414-15, 430 N.E.2d 976 (1981); LID Associates v. Dolan, 324 Ill. App.3d 1047, 1066-67, 756 N.E.2d 866 (2001); Fitton v. Barrington Realty Co., Inc., 273 Ill. App. 3d 1017, 1019, 653 N.E.2d 1276 (1995); Luminall Paints, Inc., 220 Ill. App. 3d at 803.

The issue of when a plaintiff knew or should have known of the cause of action is generally a question of fact. Clay v. Kuhl, 189 Ill. 2d 603, 609, 727 N.E.2d 217 (2000); Softcheck v. Imesch, 367 Ill. App. 3d 148, 156, 855 N.E.2d 941 (2006). Yet, this question may be determined as a matter of law when the answer is clear from the pleadings. Clay, 189 Ill. 2d at 609-10; Softcheck, 367 Ill. App. 3d at 156. As noted above, when resolving a motion to dismiss, a court must accept as true all well-pled facts in the plaintiff's complaint and draw from those facts all reasonable inferences which are favorable to the plaintiff. Borowiec v. Gateway 2000, Inc., 209 Ill. 2d 376, 413, 808 N.E.2d 957 (2004); Zych v. Tucker, 363 Ill. App. 3d 831, 833, 844 N.E.2d 1004 (2006).

Here, the record does not establish as a matter of law that, more than five years prior to December 2004, the trust beneficiaries knew or should have known of facts indicating that they had suffered an injury and that it had been wrongfully caused. Admittedly, the trust beneficiaries were aware in 1993 of the existence of the Civic Center mortgage, securing performance under the guarantee and that the guarantee guaranteed payment of the additional ground and percentage rents in accordance with the 1972 lease amendments. They were also aware that Prudential had accepted an assignment in lieu of foreclosure on the leasehold mortgages.

Yet, the record does not establish that prior to February 2004, the beneficiaries were aware of the specific provisions contained in the guarantee. In particular, the record does not indicate that the trust beneficiaries knew the guarantors had agreed to guarantee the payment of the additional

ground and percentage rents "during any period when the same may not be payable by the tenant under the Fuller Lease because of the subordination to the leasehold mortgages." Also, the record does not establish that the beneficiaries were aware that the guarantee provided that it would continue during the entire term of the Fuller Lease as to percentage rent and until January 1, 2000 as to additional ground rent. In addition, the record does not establish the trust beneficiaries knew that the guarantee stated that it would survive the assignment, sale or conveyance of the interest of the guarantors, as tenant or otherwise, in the Fuller Lease and shall not be released, diminished or affected by any such assignment, sale or conveyance. Finally, the record does not indicate that the beneficiaries were aware that the obligations of the guarantors under the guarantee were independent of their obligations as tenant under the Fuller Lease.

Here, the corrected complaint specifically alleged that the guarantee has been lost or destroyed, that Northern informed the trust beneficiaries that it was unable to locate the original or a copy of the guarantee, and that Northern has never provided the beneficiaries a copy of the guarantee. In addition, the complaint particularly alleged that the trust beneficiaries did not obtain a copy of the draft guarantee until February 2004. Northern has not disputed these factual allegations, and nothing in the record would support an inference that the beneficiaries were aware of the terms of the guarantee before February 2004.

Accepting as true the allegations in the corrected complaint, it cannot be said as a matter of law that the trust beneficiaries had sufficient knowledge to apprise them of the breach of fiduciary duty claim prior to February 2004. If the beneficiaries did not learn the terms of the guarantee until February 2004 and, until that time, did not know, nor should they have known, of their right to bring

the breach of the fiduciary duty claim, the period of limitations would not have expired until February 2009. As previously noted, the issue of when a plaintiff knew or should have known of the cause of action is a question of fact. Clay, 189 Ill. 2d at 609; Softcheck, 367 Ill. App. 3d at 156. Consequently, it cannot be said as a matter of law that the plaintiff's breach of fiduciary duty claim, which was filed in December 2004, was untimely and should have been dismissed under section 2-619 of the Code.

Northern also contends that the dismissal of the breach of fiduciary duty claim was proper because the terms of the guarantee could not have been enforced and, therefore, Northern was precluded from foreclosing on the Civic Center mortgage. Specifically, Northern asserts that the guarantee was not in effect after Prudential accepted the assignment of the Fuller Lease in lieu of foreclosure because the 1972 lease amendments provided that the percentage rent was terminated and the additional ground rent was abated until January 1, 2000. According to Northern, Prudential's acceptance of the assignment of the Fuller Lease in lieu of foreclosure extinguished these rent obligations under the lease amendments, and, because these rent obligations had been extinguished, there could have been no default in their payment that would have triggered the terms of the guarantee. We do not agree that such a construction of the relevant documents can be reached as a matter of law.

A guarantee is an agreement by one or more parties to answer to another for the debt or obligation of a third party. Williams Nationalease, Ltd. v. Motter, 271 Ill. App. 3d 594, 596, 648 N.E.2d 614 (1995), citing 38 C.J.S. Guaranty § 1 (1943). General rules of contract construction apply in interpreting the terms and conditions of a guarantee, including a contract guaranteeing

payment of rent under a lease or guaranteeing performance of other lease terms. See <u>Blackhawk Hotel Associates v. Kaufman</u>, 85 Ill. 2d 59, 64, 421 N.E.2d 166 (1981); <u>T.C.T. Building Partnership v. Tandy Corp.</u>, 323 Ill. App. 3d 114, 118, 751 N.E.2d 135(2001); <u>Williams Nationalease, Ltd.</u>, 271 Ill. App. 3d at 596. Similarly, a lease is a contract between landlord and tenant, and the rules of contract construction apply to the construction of leases. <u>Williams v. Nagel</u>, 162 Ill. 2d 542, 555, 643 N.E.2d 816 (1994); <u>Oliva v. Amtech Reliable Elevator Co.</u>, 366 Ill. App. 3d 148, 151-52, 851 N.E.2d 256 (2006).

Where the terms of a contract are clear and unambiguous, they must be given effect as written, and under those circumstances, the meaning of the contract is a question of law. <u>T.C.T. Building Partnership</u>, 323 Ill. App. 3d at 118. However, where the provisions of a contract are ambiguous, its construction becomes a question of fact, and parol evidence is admissible to resolve the ambiguity. <u>Farm Credit Bank</u>, 144 Ill. 2d at 447; see also <u>Air Safety, Inc. v. Teachers Realty Corp.</u>, 185 Ill. 2d 457, 462-63, 706 N.E.2d 882 (1999); <u>Dean Management, Inc. v. TBS Const., Inc.</u>, 339 Ill. App. 3d 263, 269, 790 N.E.2d 934 (2003). A contract is ambiguous if it is susceptible to more than one reasonable interpretation. <u>Farm Credit Bank</u>, 144 Ill.2d at 447; <u>Air Safety, Inc.</u>, 185 Ill. 2d at 462-63; <u>Dean Management, Inc.</u>, 339 Ill. App. 3d at 269.

In this case, the guarantee provided that it was executed to guarantee payment of the additional ground and percentage rents "during any period when the same may not be payable by the tenant under the Fuller Lease because of the subordination thereof to the Original Leasehold Mortgages", and the guarantee specifically recognized that these rent obligations were subordinated "to the extent and on the conditions set forth in [the] amendment to the Fuller Lease dated August

21

23, 1972." Therefore, the determination of whether and under what circumstances the guarantee could have been enforced is dependent upon the interpretation of the subordination clause contained in the 1972 lease amendments. Any ambiguity in the subordination provision necessarily would render the guarantee ambiguous also.

As noted above, paragraph 13 of the August 23, 1972 lease amendments added a new section 3.4 to the lease, which provided that Northern agreed to subordinate the trust's right to collect the additional ground and percentage rents to the payments due Prudential on the leasehold mortgages. This section also specifically stated that, in the event of a foreclosure of the leasehold mortgages or an assignment of the leasehold interest in lieu of foreclosure, Prudential's obligation to pay additional ground rent would be abated, until January 1, 2000. Paragraph 14 of the lease amendments added a new section 3.5 to the lease, which provided that the obligation to pay percentage rent would be terminated in the event of a foreclosure of the leasehold mortgages or an assignment of the leasehold interest in lieu of foreclosure.

Northern has argued that the terms of the lease amendments providing for the abatement of additional ground rent until January 1, 2000, and for the termination of percentage rent are wholly independent of the subordination of those rent obligations to the leasehold mortgages. According to Northern, Prudential's acceptance of the assignment of the Fuller Lease in lieu of foreclosure extinguished the obligation to pay the additional ground and percentage rents under the lease amendments, and the trust's failure to receive those rents was not because of the subordination, but rather was because of the effect of the independent provisions in the lease amendments. Northern further argues that where the trust's failure to receive the additional ground and percentage rents was

22

caused by the fact that those rent obligations had been extinguished, and was not because of the subordination, the terms of the guarantee had not been triggered. In Northern's view, after Prudential accepted assignment of the Fuller Lease in lieu of foreclosure, there could not have been any default on the rent obligations that had been extinguished, and the guarantee could not have been enforced to require the guarantors to pay the additional ground and percentage rents.

We observe, however, that the lease amendments may also be read to mean that the abatement of additional ground rent until January 1, 2000, was a term of the subordination clause that, when triggered, would activate the obligations under the guarantee. As previously noted, the lease amendments added a new section 3.4 to the lease, which consists of two paragraphs under the heading "SUBORDINATION OF PERCENTAGE RENT AND ADDITIONAL GROUND RENT". The first paragraph of this section states that the trust's rights to collect the percentage rent and the additional ground rent were subordinated to the leasehold mortgagee's rights to collect the indebtedness secured by the leasehold mortgages. The second paragraph of this clause states that, if the leasehold mortgagee forecloses or accepts an assignment of the leasehold estate in lieu of foreclosure, no additional ground rent shall be payable by the leasehold mortgagee or its assigns, except additional ground rent based on appraisals made on and after January 1, 2000; any additional ground rent based on appraisals made after January 1, 2000, shall not be subordinated to the lien of any mortgage.

Read together, these two paragraphs can reasonably be interpreted to provide that the abatement of the additional ground rent until January 1, 2000 is a term of the subordination. The abatement term of the subordination clause would be triggered by the leasehold mortgagee's

foreclosure or acceptance of the leasehold estate in lieu of foreclosure. In this circumstance, the additional ground rent would not be payable under the Fuller Lease because of the subordination.

The guarantee provided that "to assure [the Fuller Trust] the payment of [the] Percentage Rent and Additional Ground Rent notwithstanding the subordination," the guarantors agreed to "guarantee the payment of said Percentage Rent and Additional Ground Rent during any period when the same may not be payable by the tenant under the Fuller Lease because of the subordination thereof to the Original Leasehold Mortgages." It also stated that it would "continue during the entire term of the Fuller Lease as to Percentage Rent and until January 1, 2000 as to Additional Ground Rent." Under the interpretation of the lease amendments set forth above, where the additional ground rent would not be payable under the Fuller Lease because of the subordination, the obligations imposed under the guarantee would be in effect until January 1, 2000. Therefore, the language of the draft guarantee, when read in conjunction with the lease amendments, could reasonably be interpreted to require the guarantors to pay the additional ground rent due after Prudential accepted assignment of the Fuller Lease in lieu of foreclosure.

In addition, we observe that although the termination of the percentage rent is contained in a separate section, it is also directly linked to the leasehold mortgagee's foreclosure or acceptance of the leasehold interest in lieu of foreclosure, which is the only circumstance under which the percentage rent would not be payable under the Fuller Lease. Consequently, these two lease amendments may reasonably be interpreted to provide that the termination of the percentage rent and the abatement until January 1, 2000, of the additional ground rent were not independent but were

24

terms of the subordination. Under this interpretation, Prudential's acceptance of an assignment of the Fuller Lease in lieu of foreclosure would trigger the obligations under the guarantee.

Because the language of the August 23, 1972 lease amendments and the provisions of the guarantee are susceptible to more than one reasonable interpretation, they are ambiguous. As a result, the construction of these contract provisions present questions of fact, and their meaning cannot be discerned as a matter of law. See Farm Credit Bank, 144 Ill. 2d at 447; Air Safety, Inc., 185 Ill. 2d at 462-63; Dean Management, Inc., 339 Ill. App. 3d at 269. Accordingly, we hold that the breach of fiduciary duty claim cannot be dismissed as a matter of law under section 2-619 of the Code, and the circuit court erred in dismissing Count I.

Finally, we address the dismissal of Count II, alleging, in the alternative, a claim for spoliation of evidence based on the loss of the written guarantee. The notice of appeal indicates that Fuller Holdings sought reversal of the dismissal of the spoliation of evidence claim. Because its brief does not include any argument or citation to relevant authorities to support this challenge, we may consider this argument waived on appeal. See Official Reports Advance Sheet No. 12 (June 7, 2006), R. 341(h)(7), eff. September 1, 2006 (argument portion of brief shall contain the contentions of the appellant and the reasons therefore, with citation of the authorities and the pages of the record relied on, and points not argued are waived); People v. Lantz, 186 Ill. 2d 243, 261-62, 712 N.E.2d 314 (1999). However, we observe that the waiver doctrine is an admonition to the parties and not a limitation on the jurisdiction of this court. Illinois State Chamber of Commerce v. Filan, 216 Ill. 2d 653, 664, 837 N.E.2d 922 (2005). Therefore, in order to provide a just result and to maintain a sound and uniform body of precedent, a court of review may exercise its discretion to disregard

considerations of waiver that stem from the adversarial nature of our system. <u>Illinois State Chamber of Commerce</u>, 216 Ill. 2d at 664; <u>Dillon v. Evanston Hospital</u>, 199 Ill. 2d 483, 504-05, 771 N.E.2d 357 (2002). In this case, we believe it is appropriate to review the dismissal of the spoliation of evidence claim, and we decline to find waiver. See <u>Illinois State Chamber of Commerce</u>, 216 Ill. 2d at 664.

The circuit court dismissed as moot the spoliation of evidence claim based on the fact that the breach of fiduciary duty claim had been dismissed pursuant to a prior release. In light of our holding that the circuit court erred in dismissing the breach of fiduciary duty claim, the basis for the circuit court's dismissal of the spoliation of evidence claim falls.

To state a cause of action for the negligent spoliation of evidence, a plaintiff must plead the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, an injury proximately caused by the breach, and damages. <u>Boyd v. Travelers Ins. Co.</u>, 166 Ill. 2d 188, 194-95, 652 N.E.2d 267 (1995). Although the general rule is that there is no duty to preserve evidence, a duty to preserve evidence may arise through an agreement, a contract, a statute, or another special circumstance. <u>Boyd</u>, 166 Ill. 2d at 195. In any of the foregoing instances, a defendant owes a duty of due care to preserve evidence if a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action. <u>Boyd</u>, 166 Ill. 2d at 195.

Here, Count II of the corrected complaint sufficiently alleged a duty to preserve the guarantee based on the fiduciary relationship between the trustee and the trust beneficiaries and upon the trustee's obligation to maintain all records that relate to the assets and interests of the trust. It also sufficiently alleged a breach of that duty based on Northern's loss of the written guarantee. In

26

No. 1-06-1533

addition, the corrected complaint alleged causation and damages resulting from the loss of the guarantee based on the inability to establish that the trust had a right to foreclose the mortgage on the Civic Center Parcel. Because Count II of the corrected complaint alleged facts sufficient to state a claim for negligent spoliation of evidence, the circuit court erred in dismissing this claim.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause is remanded for further proceedings.

Reversed and Remanded.

SOUTH, J., concurs.

PRESIDING JUSTICE WOLFSON, dissenting:

I believe the record supports the trial court's decision that this action is barred by the release of June 26, 2002.

True, a release will not be construed to defeat a valid claim that was not within the contemplation of the parties at the time it was executed. Carona v. Illinois Central Gulf R.R. Co., 203 Ill. App. 3d 947, 951 (1990). But in order to determine what the parties contemplated courts are not prevented from inquiring into "surrounding circumstances." Carlisle v. Snap-On-Tools, 271 Ill. App. 3d 833 (1995).

Here, the purpose of the litigation was to end the trust and distribute its assets. In 1993 the beneficiaries knew about the existence of the Civic Center Mortgage and they knew the mortgage secured performance under the guarantee. They knew the guarantee covered payment of the additional ground and percentage rents in accord with the 1972 lease amendments. And they knew Prudential had accepted an assignment in lieu of foreclosure on the leasehold mortgages.

27

No. 1-06-1533

I would find labels placed on the beneficiaries' claims do not erase the reality that the additional ground and percentage rents were property of the trust and therefore are covered by the release. The beneficiaries might not have had possession of the original guarantee, but they knew enough about its terms to conclude something should have been done about collection of the rents.

I respectfully dissent.